# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

    Plaintiff,

    v.                                                                     Case No. 24-CR-112-PP-SCD

**IAN ALAN OLSON,**

    Defendant.

## RECOMMENDATION AND ORDER
## ON DEFENDANT'S MOTION TO SUPPRESS AND FOR A *FRANKS* HEARING

    Ian Olson, a convicted felon, is charged with unlawfully possessing a firearm and ammunition. The police found the prohibited items while executing a search warrant at Olson's apartment for evidence of stalking and bail jumping. Olson has moved to suppress all evidence recovered from his apartment, arguing that the search warrant was not supported by probable cause. Specifically, Olson contends that the warrant affidavit did not allege any facts connecting him to the apartment and that the detective who submitted the warrant application omitted crucial contextual information. He seeks a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to explore the validity of the search warrant affidavit. The government opposes the motion.

    Because the search warrant failed to establish any connection whatsoever between the apartment and Olson *or* the criminal activity attributed to him in the affidavit, the issuing judge lacked a substantial basis for concluding that probable cause existed. I also conclude that the good faith exception to the exclusionary rule does not apply. Accordingly, I will recommend that Olson's motion to suppress be granted.

# BACKGROUND

On October 16, 2023, Brookfield police detective Christopher Foster applied for a warrant to search an apartment located in Nashotah, Wisconsin, for evidence related to stalking and bail jumping allegedly committed by Ian Alan Olson. *See* Def.'s Mot. Ex. 1, ECF No. 24-1 at 4–12. The affidavit submitted in support of the search warrant application noted that Olson had been arrested in March 2021 for firing a paintball gun at uniformed military members in Pewaukee. Ex. 1 at 5, ¶ 2. After that arrest, the police found a military-style ballistic vest and a gas mask in Olson's vehicle and an AR-15 rifle and ammunition in Olson's apartment. The affidavit also noted that Olson was prohibited from possessing firearms as a result of being convicted in federal court for the paintball shooting. *Id.* at 5, ¶ 3.

The affidavit then set forth a timeline of Olson's contacts with a U.S. Armed Forces recruiting center in Brookfield, Wisconsin. *See* Ex. 1 at 5, ¶ 1. On November 14, 2022, Olson was trespassed from the property after he admitted to conducting a silent protest of the recruiting center. *Id.* at 5, ¶ 4. Several months later, on May 24, 2023, the police observed Olson standing outside the recruiting center holding a sign that stated, "I am Q" and "Need your help," while carrying a toy AR-15 style rifle. *Id.* at 6, ¶ 5. Later that same day, the police arrested Olson for trespassing on the property. *Id.* at 6, ¶ 6. Olson had handed staff sergeant J.M. a nineteen-page letter stating what was wrong with the U.S. Army.

On August 31, 2023, Brookfield police responded to the recruiting center for a criminal damage to property/disorderly conduct complaint. Ex. 1 at 6, ¶ 7. Someone had written "Oath Breaker" in chalk outside the center's door, and all government vehicles parked in the rear lot had "Nazi Dog" and swastikas drawn on the windows in marker. J.M. told the police that, a few days prior to that incident, he received a text message from Olson that referenced

"the violation of Olson's First and Fifth Amendment rights as well as paperwork being filed that would seal [J.M.'s] fate." *Id.* at 6, ¶ 8.

The following day, the police responded to another property damage complaint at the recruiting center. Ex. 1 at 6, ¶ 9. This time, someone had slashed the tires of a government vehicle with a knife, written "Nazi Dog" on other vehicles, and dented the door to a vehicle. Also, a handwritten note referring to abuse of power and civil rights violations had been placed under a vehicle's windshield wiper.

Just three days later, the police responded to yet another property damage complaint at the recruiting center—the third in five days. Ex. 1 at 6, ¶ 10. Overnight someone had spray painted "Civil Rights Violators" and "Self-Identified as a Domestic Threat" on the door to the Army recruiting office. Also, someone had spray painted "This is where patriots are made" on the Marines office door.

Hoping to catch the vandalizer in the act, the police set up overnight surveillance at the recruiting center. Ex. 1 at 6–7, ¶ 11. At about 1:00 a.m. on September 5, 2023, the police observed a blue Subaru enter the center's rear lot and park next to a vehicle that had been damaged during one of the prior incidents. Olson exited the Subaru, hovered around the other vehicle, and placed items under the windshield wipers. After Olson returned to the Subaru, the police stopped him and asked if he had just slashed the vehicle's tires; Olson said "no." But Olson nodded his head up and down when asked if he had slashed the tires earlier. Inside the trunk of Olson's vehicle, the police found an AR-15 style paintball gun. *Id.* at 7, ¶ 12.

The police followed up on property damage complaints on October 9, 2023. Ex. 1 at 7, ¶¶ 13–14. On of the recruiting center's employees, T.G., told the police that he had received several text messages on his personal cell phone from a number ending in 5122. The sender

3

said he was a "QAnon" member, and he tried to recruit T.G. into a cult. One of the messages read, "Save my number, I may need you in the future . . . but I am trying to do this without others such as yourself. The 'work' is not something most could handle and the path you must walk to achieve it . . . I do not wish upon by worst enemies . . . we're all fam . . . we're all brothers . . . few treat one another as such . . ." T.G. told the police he didn't know how the sender obtained his personal cell phone number, as it wasn't posted or advertised on anything related to the recruiting center. Another recruiting center employee, T.M., said he had also recently received text messages from the 5122 number on his military issued cell phone. The sender claimed that his rights were being infringed upon, and he requested contact information for various military police investigation units. The affidavit noted that Olson had listed the 5122 number as his number during prior law enforcement contacts. *Id.* at 7, ¶ 15. The affidavit also noted that employees at the recruiting center, including T.G. and T.M., reported fearing for their safety as a result of Olson's escalating actions and that for about two weeks employees worked from home, wore civilian clothing, and checked to make sure Olson wasn't there before leaving the building. *Id.* at 8, ¶ 16.

Thereafter, the affidavit detailed the ubiquity of cell phones and the storage of information on those and other digital devices. *See* Ex. 1 at 8–12, ¶¶ 17–29. The affidavit indicated that a review of Olson's electronics was necessary to investigate the violation of a court order and to further investigate the alleged stalking, as recruiting center employees had received messages from a number linked to Olson. *Id.* at 12, ¶ 29. The affidavit also indicated that, because the messages and Olson's actions showed an attempt to plan a larger attack on military locations, law enforcement needed to review all electronic devices located within Olson's residence or on his person.

4

A state circuit court judge authorized the warrant, and the police executed it the following morning. *See* Ex. 1, ECF No. 24-1 at 1–3; *see also* Compl. ¶ 6, ECF No. 1. The warrant permitted the police to search the Nashotah apartment (4670 Woodfield Ct Apartment #7); "vehicles located at the property during the search that are owned or controlled by the occupants of the residence," including the blue Subaru Olson drove; persons located on the property; any storage buildings, storage spaces, outbuildings, or garages assigned to the apartment; Olson's person; and all cell phones and other digital devices possessed by Olson, found on Olson's person, or found at the apartment. Ex. 1 at 1. The warrant also described the apartment building and allowed the police to "search, seize, and analyze . . . things [that] were used in the commission of or may constitute evidence of . . . Stalking . . . and Bail Jumping." *Id.* at 1–2. The affidavit listed specific things, including but not limited to "[i]tems that would tend to show dominion and control of the property searched" (e.g., utility bills, telephone bills, correspondence, rental agreements, etc.) and "[p]aperwork and writings that would show stalking behavior" (e.g., personal information relating to employees of the recruiting center). *Id.* During the search, the police found a .40 caliber pistol and many rounds of unfired ammunition. *See* Compl. ¶¶ 6–8.

In May 2024, a federal grand jury indicted Olson for unlawfully possessing the pistol and the ammunition found during the apartment search. *See* Indict., ECF No. 2. The matter is assigned to United States District Judge Pamela Pepper for trial and to me for resolving pretrial motions. *See* 28 U.S.C. § 636; Fed. R. Crim. P. 59; E.D. Wis. Gen. L. R. 72. On October 11, 2024, Olson filed a motion to suppress and a request for a *Franks* hearing. *See* Def.'s Mot., ECF No. 22. The government filed a response in opposition to the motion and

5

the request for a hearing. *See* U.S.'s Resp., ECF No. 28. Olson submitted his reply on November 22, 2024. *See* Def.'s Reply, ECF No. 31.

## DISCUSSION

Olson seeks to suppress all evidence recovered during the search of the Nashotah apartment, including the firearm and ammunition that serve as the basis of the one-count indictment. He presents two arguments. First, Olson contends that the search warrant was not supported by probable cause. Second, Olson contends that the search warrant affidavit omitted facts material to the probable-cause determination. He requests a *Franks* hearing to prove the invalidity of the warrant and, ultimately, an order suppressing all evidence recovered from that search. The government maintains that Olson's motion should be denied because the warrant was supported by probable cause and because Olson has failed to show that he is entitled to a *Franks* hearing. Alternatively, the government maintains that, even if the warrant was invalid, no evidence should be suppressed because the officers who executed the warrant relied on it in good faith.

**I.    The Issuing Judge Lacked a Substantial Basis for Concluding That Probable Cause Existed to Search the Nashotah Apartment**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Where, as here, "an affidavit is the only evidence presented to a judge in support of a search warrant, the validity of the warrant rests solely on the strength of the affidavit." *United States v. McMillian*, 786 F.3d 630, 639 (7th Cir. 2015) (quoting *United States v. Peck*, 317 F.3d 754, 755 (7th Cir. 2003)). "To determine whether probable cause existed, the court must ask whether, 'based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent

6

person to believe that a search will uncover evidence of a crime.'" *Id.* (quoting *Peck*, 317 F.3d at 756); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) (holding that probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular place"). "The [issuing] judge's finding of probable cause 'carries a strong presumption of correctness.'" *United States v. Harris*, 996 F.3d 451, 461 (7th Cir. 2021) (quoting *United States v. Sanchez-Jara*, 889 F.3d 418, 421 (7th Cir. 2018)). Accordingly, the task of "a reviewing court is simply to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *Id.* (quoting *Gates*, 462 U.S. at 238–39).

Olson argues that there are not one but two fundamental flaws in the warrant affidavit. First, he asserts that the affidavit failed to establish probable cause to believe that evidence of stalking would be found at the Nashotah apartment. Second, he asserts that the affidavit did not contain any facts linking that residence to the items sought by the police, or even to him more generally.

### A. There was little indication that Olson engaged in stalking or bail jumping

A central problem with the affidavit is that it contains no factual allegations linking Olson to the crimes it alleges he committed. Although the affidavit obviously established probable cause to believe that Olson had criminally damaged property—after all, he was caught red-handed in the middle of the night—the affidavit did not seek any evidence relating to that offense. *See id.* at 4–5. Instead, the affidavit sought evidence of two different crimes: stalking and bail jumping. Ex. 1 at 5. As to bail jumping, the affidavit did not include any facts suggesting that Olson was subject to any bond conditions at the time. There is thus no connection alleged between Olson and the crime of bail jumping.

7

Case 2:24-cr-00112-PP    Filed 12/20/24    Page 7 of 18    Document 36

The remaining question is whether the affidavit contains facts suggesting that Olson had engaged in stalking. Let's assume that evidence of stalking generally will be found in the stalker's home. "When probable cause exists to believe an individual has committed a crime involving physical evidence, and when there is no articulable, non-speculative reason to believe that evidence of that crime was not or could not have been hidden in that individual's home, a [judge] will generally be justified in finding probable cause to search that individual's home." *United States v. Aljabari*, 626 F.3d 940, 946 (7th Cir. 2010). Applying that principle, the Seventh Circuit has consistently recognized that evidence of drug dealing "is likely to be found where the dealers live." *United States v. Zamudio*, 909 F.3d 172, 176 (7th Cir. 2018) (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). The same is true in the case of stalking. Because stalking is a continuous crime, it's reasonable to conclude that instrumentalities of that offense—writings, photographs, videos, messages, or other digital evidence—would be preserved in the stalker's home for future use and not destroyed. Here, the affidavit sought "[p]aperwork and writings that would show stalking behavior" and "[c]ell phones or other mobile electronic devices." Ex. 1 at 4. It is reasonable to infer that such evidence likely would be found where the stalker lives.

However, that general proposition does not help the government in our case because the evidence of stalking was thin to nonexistent. Wisconsin's stalking statute requires proof of (among other things) "a course of conduct directed at a specific person that would cause a reasonable person under the same circumstances to suffer serious emotional distress or to fear bodily injury to or the death of himself or herself or a member of his or her family or household." Wis. Stat. § 940.32(2)(a). The affidavit alleges that Olson conducted a silent protest outside the recruiting center, stood outside the center holding a sign that said "I am

8

Q" and "Need your help" while carrying a toy rifle, wrote "Oath Breaker" outside the center's front door, drew in marker on the windows of every government vehicle in the center's rear lot, slashed the tires of one vehicle, left pamphlets on the windows of several vehicles, and spray painted "Civil Rights Violators" and "Self-Identified as a Domestic Threat" on the Army recruiting door. Ex. 1 at 5–7, ¶¶ 4–14. The affidavit therefore describes a course of conduct directed at the U.S. Armed Forces *generally* and specifically the Brookfield recruiting center.

But there's little evidence to suggest Olson focused on any specific person. The affidavit alleges that Olson handed J.M. a letter stating what was wrong with the U.S. Army, sent J.M. a text message referencing the violation of Olson's constitutional rights and paperwork that would seal J.M.'s fate, sent T.G. messages attempting to recruit him into a cult, and sent T.M. a message referencing the infringement upon Olson's rights and requesting contact information for military investigation units. Ex. 1 at 6–7, ¶¶ 6, 8, 13–14. Those actions do not appear to constitute a course of conduct—"a series of 2 or more acts carried out over time," Wis. Stat. § 940.32(1)(a)—directed at a *specific person.* Moreover, the communications do not seem menacing enough that they would cause a reasonable person under the same circumstances to suffer serious emotional distress or to fear bodily injury or death. In the absence of any allegations suggesting that Olson targeted a certain employee or his or her vehicle, the explicit allegations that he vandalized all government vehicles in the center's lot suggest that he indiscriminately harassed *anyone* associated with the military. Perhaps the police had additional information that supported the stalking charges Olson faces in state court; that information, however, was not included in the search warrant affidavit and cannot justify the issuing judge's probable-cause finding.

9

### B. The affidavit failed to establish any nexus with the apartment

Even if the affidavit had established probable cause to believe that Olson engaged in stalking, it did not provide any facts connecting him to the Nashotah apartment. For example, the affidavit did not allege that Olson owned the apartment, lived in the apartment, parked his car at the apartment, kept his personal belongings at the apartment, spent time at the apartment, or even merely that he was *seen* at the apartment during the relevant time period. The affidavit also never explained how the police identified the apartment as the target residence. Aside from describing the place to be searched, the affidavit never mentioned the Nashotah apartment at all. *See* Ex. 1 at 4–12. For all the reviewing judge knew, the address might have been plucked at random from the local telephone book.

The government acknowledges that the affidavit "could have, and probably should have, included a sentence clearly stating that [the Nashotah apartment] was Olson's residence." U.S.'s Resp. 7. This is a paragon of understatement. Nevertheless, according to the government, the affidavit's failure to state explicitly that the Nashotah apartment was Olson's residence is not a fatal flaw. The government relies on *United States v. Hunter*, 86 F.3d 679 (7th Cir. 1996), to argue that it was reasonable for the issuing judge to infer that the apartment belonged to Olson.

*Hunter* involved a father-son bank robbery duo. After arresting the father and finding incriminating evidence in his home, law enforcement obtained a warrant to search the son's home. *Hunter*, 86 F.3d at 681–82. Inside, they found evidence tying the son to the bank robberies, and he was later convicted in federal court. On appeal, the son argued that probable cause did not support the search warrant because the application and affidavit didn't state how the FBI knew the place to be searched was his residence. The Seventh Circuit held that

10

the "affidavit's failure to state explicitly that [the place to be searched] was [the son's] residence, by itself, is not a fatal flaw." *Id.* at 681. The court further held that the supporting search warrant materials clearly established that the place to be searched was the son's residence: an attachment to the affidavit listed the residence's address, the affidavit referred four times to the son's residence, and the affidavit did not reference any other place connected to the son. *Id.* at 681–82. Thus, "the only logical conclusion supported by a common-sense reading of the affidavit" was that the address listed on the attachment was the son's residence. *Id.* at 682 (citing *Gates*, 462 U.S. at 236).

*Hunter* is distinguishable from our case. In contrast to the affidavit challenged in *Hunter*, which referred to the son's residence four times, the affidavit here did not clearly establish that the place to be searched was Olson's residence. The affidavit mentioned "Olson's apartment" one time, but that was related to a previous search in March 2021. *See* Ex. 1 at 5, ¶ 2. The affidavit never specified where that apartment was located or suggested it was the same place Olson lived two and one-half years later in October 2023. Nor did the affidavit contain any facts or observations linking Olson to the Nashotah apartment.

The government points to several statements in the affidavit that it says, taken together, established the required nexus between Olson and the Nashotah apartment. *See* U.S.'s Resp. 8–9. The government notes that the Nashotah apartment was the only residence listed in the affidavit and that Olson was the only suspect identified. The government also asserts that the warrant indirectly identified Olson as an occupant of the residence when it listed the address and sought to search vehicles located at the property that were owned or operated by the occupants of the residence, including the blue Subaru the police had previously seen Olson driving. Finally, the government points out that the affidavit sought to search Olson's property

11

and expressed the need to search all electronic devices located within his residence and other items typically found in a personal residence. The government insists that the only logical conclusion supported by a common-sense reading of the warrant and its supporting materials is that the Nashotah apartment was Olson's residence.

Although judges certainly may draw reasonable inferences when reviewing a search warrant application, those inferences must be grounded in facts and evidence. *See United States v. Jones*, 56 F.4th 455, 475 (7th Cir. 2022) (explaining that a search warrant affidavit "must set forth facts" to establish probable cause); *United States v. Matthews*, 364 F. Supp. 3d 921, 929 (S.D. Ill. 2019) (noting that inferences are reasonable only where "there is *some* evidence from which that inference can be drawn"); *Bouch v. State*, 143 P.3d 643, 650 (Wyo. 2006) ("[P]ermissible inferences must arise from facts appearing in the affidavit."). To support its argument that the issuing judge reasonably could have inferred that the Nashotah apartment was Olson's residence, the government relies primarily on the affidavit's *description* of the places to be searched and the things to be seized. Those descriptions, however particular, cannot substitute for facts establishing a nexus between the place to be searched and the criminal activity described in the affidavit. Likewise, that the police wanted to search Olson's residence does not establish that the Nashotah apartment was in fact his residence. *See Bouch*, 143 P.3d at 651 ("The fact that an officer is requesting a search of a particular location has no bearing on whether or not probable cause exists."). The only supporting *facts* the government points out are that the Nashotah apartment was the only residence listed in the affidavit and that Olson was the only suspect identified. The government, however, provides no authority to suggest that those two facts alone are sufficient to establish the required nexus between Olson, the Nashotah apartment, and the items sought.

12

In contrast, substantial authority supports Olson's argument that a failure to establish a connection between the suspect and the place to be searched is fatal to the probable-cause determination. For example, in *Moultrie*, the Seventh Circuit declined to find probable cause in a case involving a search warrant affidavit that lacked specific facts tying the defendant to the residence searched. *United States v. Moultrie*, Nos. 99-2199 & 99-2200, 2000 U.S. App. LEXIS 1513, at *9–13 (7th Cir. Feb. 2, 2000) (affirming the denial of the suppression motion under the good faith exception). Likewise, the court in *Matthews* distinguished *Hunter* and found probable cause lacking where a search warrant affidavit failed to allege facts from which a judge reasonably could infer that evidence would be found in the suspect's residence and failed to provide any factual basis to support the affiant's belief that the suspect lived at the place to be searched. 364 F. Supp. 3d at 927–29. Other courts have reached the same conclusion in the face of similar search warrant affidavits. *See, e.g.*, *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005) (government conceded that a search warrant clearly lacked probable cause because the supporting affidavit "failed to establish any connection between the place to be searched and [the suspect] or the suspected criminal activity"); *United States v. Laughton*, 409 F.3d 744, 747–48 (6th Cir. 2005) (finding probable cause lacking where a search warrant affidavit "failed to indicate any connection between the defendant and the address given"); *Bouch*, 143 P.3d at 647–52 (same); *United States v. Parker*, No. 17-CR-1034-LRR, 2018 WL 340048, 2018 U.S. Dist. LEXIS 3728, at *17–18 (N.D. Iowa Jan. 9, 2018) (same).

The government's argument that judges should be allowed to *assume* the link between a subject and the place to be searched would open the door (literally) to allowing searches of just about *any* location (or cell phone, etc.) imaginable. All the government would have to do

13

is provide evidence of criminal activity committed by a given subject. Then, without needing to link that activity to the place or thing to be searched, they'd have *carte blanche* to obtain a warrant to search anywhere in America. That's not allowed by the Fourth Amendment.

C. *Hunter* **suggests the combination of flaws dooms the warrant**

Although *Hunter* may be read to allow a reviewing court (in certain circumstances) to draw the inference that a residence referenced in an affidavit is the subject's residence even if it does not explicitly make that clear, the case also establishes that the totality of the circumstances is what controls. *See Hunter*, 86 F.3d at 681 (noting that a prior case found probable cause lacking based on "the totality of the circumstances, including not only the failure to show how the police knew that the . . . apartment was truly one of [the defendant's] addresses but the paucity of information suggesting that a search of the . . . address would uncover evidence of wrongdoing") (citation and internal quotation marks omitted). Here, we have a two-fer. Not only is the link between the residence and Olson wholly absent from the affidavit, the link between Olson and the crimes alleged in that affidavit is also frustratingly limited. Given those two fundamental problems, it would be difficult to believe a search of the address listed on the affidavit would "uncover evidence of wrongdoing." *Id.*

In sum, because the search warrant affidavit failed to establish that Olson was engaged in the criminal activity detailed in the warrant (stalking and bail jumping), and because it contains no factual nexus between the Nashotah apartment and Olson, the issuing judge lacked a substantial basis for concluding that probable cause existed to search the apartment.

## II. The Good Faith Exception Does Not Apply Because the Supporting Affidavit Was So Lacking in Indicia of Probable Cause That the Executing Officers' Belief in Its Existence Was Unreasonable

Even if a search warrant proves defective under the Fourth Amendment, a motion to suppress will be denied if the officers relied upon the warrant in good faith. *See United States v. Leon*, 468 U.S. 897, 922 (1984). "[A]n officer's decision to obtain a warrant creates a presumption that the officer acted in good faith." *United States v. Yarber*, 915 F.3d 1103, 1106 (7th Cir. 2019) (citing *United States v. Orozco*, 576 F.3d 745, 750 (7th Cir. 2009)). A defendant may rebut this presumption by showing (1) "that the judge who issued the warrant abandoned his neutral, detached role and acted as a rubber stamp for the police"; (2) "that the affiant intentionally or recklessly misled the judge"; (3) "that the supporting affidavit is so lacking in indicia of probable cause that an officer's belief in its existence would have been entirely unreasonable"; or (4) "that the warrant itself is so facially deficient that the executing officers could not reasonably have believed it to be valid." *United States v. Woolsey*, 535 F.3d 540, 546 (7th Cir. 2008) (citing *Leon*, 468 U.S. at 923; *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007)).

The ultimate question in a case like this is: how weak does the nexus between criminal activity and the residence need to be before it flunks *Leon*'s good faith test? The Sixth Circuit explains that, to satisfy *Leon*, a warrant must contain at least a "minimally sufficient nexus":

> Even if an affidavit describing a suspect's drug activity does not establish a probable-cause nexus between the place to be searched and the evidence of that activity, the affidavit will avoid the bare-bones label so long as it identifies a minimally sufficient nexus between the two. What is the difference between a proper nexus (sufficient for probable cause) and a minimal one (sufficient for *Leon*)? There obviously must be daylight between the two standards because *Leon*'s exception applies only when an affidavit falls short of probable cause. We have described a minimally sufficient nexus as one in which there is some connection, regardless of how remote it may have been—some modicum of

15

> evidence, however slight—between the criminal activity at issue and the place to be searched.

*United States v. Reed,* 993 F.3d 441, 450–51 (6th Cir. 2021) (citations and internal quotation marks omitted).

Here, we do not even have "some modicum of evidence, however slight" that the Nashotah apartment was connected to Olson. What's more, although the warrant established probable cause that Olson had criminally damaged property, the affidavit did not seek any evidence related to *that* offense. Instead, the warrant sought evidence of the crimes of bail jumping and stalking. But, as discussed above, the affidavit did not contain any facts suggesting that Olson was out on bail at the time of his actions, and the affidavit did not sufficiently allege that Olson had engaged in stalking. So really the affidavit whiffs on both counts. Given the utter lack of factual basis connecting the Nashotah apartment to Olson or to the crimes alleged in the warrant, the executing officers' reliance on the warrant was unreasonable. Other courts faced with similar affidavits have declined to apply the good faith exception. *See, e.g.*, *Gonzales*, 399 F.3d at 1228–31 (finding that the good faith exception did not apply where a search warrant affidavit failed to provide any factual basis connecting the place to be searched to the defendant or suspected criminal activity); *Laughton*, 409 F.3d at 748–52 (same); *United States v. Hove*, 848 F.2d at 137–40 (9th Cir. 1988) (same); *Parker*, 2018 U.S. Dist. LEXIS 3728, at *18–24 (same).

By contrast, in *Reed* (the Sixth Circuit case block-quoted above) the police at least offered evidence that Reed's girlfriend lived at the home they searched, and they knew that Reed and the girlfriend were said to be living together. The affiant also watched both of them leave the searched home on at least one occasion. Although it was questionable whether those minimal links established probable cause of drug-dealing activity at the home, there was

16

enough meat on the bone to invoke *Leon*'s good faith exception to the exclusionary rule. *See Reed,* 993 F.3d at 451–52. Here, by contrast, we must ask: where's the beef?

In sum, this isn't the first case in which a warrant revealed a problematic nexus with the place to be searched. In the cases where courts find that the good faith exception applies, however, there is at least *some* shaky or tenuous indication that the subject had a connection with the residence. In other words, when probable cause is merely weak, or even possibly ephemeral, the good faith doctrine applies. On the other hand, when there is *zero* probable cause linking the residence and the criminal activity, the exception does not apply. This distinction actually makes sense. When the question of probable cause is one of *degree*—probable cause may be arguable, thin, weak, whatever—we would not expect the police to second-guess the issuing judge's probable cause finding. After all, that's a legal determination best left to the judge. But when the nexus with the place to be searched is wholly absent, it no longer makes any sense for the officer to defer to the issuing judge's weighing of probable cause because it should be clear that there was nothing to weigh. Any reasonable officer could see that the affiant essentially forgot to include any information connecting the place to be searched with the criminal activity alleged. It's not an unreasonable ask to require law enforcement to ensure there is some modicum of a nexus before executing a search warrant at the proposed location. Accordingly, I conclude that the good faith exception does not apply.

## CONCLUSION

Because the search warrant and its supporting materials failed to establish any connection whatsoever between the Nashotah apartment and Olson *or* the crimes attributed to him in the affidavit, the issuing judge did not have a substantial basis for concluding that

17

probable cause existed to search the apartment, and the good faith exception to the exclusionary rule does not apply. Therefore, I do not address Olson's alternative argument and request for a *Franks* hearing. I therefore **DENY as moot** the defendant's request for a *Franks* hearing, ECF No. 22, and **RECOMMEND** the district judge **GRANT** the defendant's motion to suppress, ECF No. 22.

The court directs the parties' attention to 28 U.S.C. § 636(b)(1)(A), (B), and (C), Fed. R. Crim. P. 59(a) and (b)(2), and E.D. Wis. Gen. L. R. 72(c), whereby written objections to any order or recommendation herein, or part thereof, may be filed within fourteen days of the date of service of this order and recommendation. Objections must be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the district judge in writing.

Dated at Milwaukee, Wisconsin, this 20th day of December, 2024.

_____
STEPHEN C. DRIES
United States Magistrate Judge